**WHITE & CASE LLP**
Mark E. Gustafson (SBN 198902)
mgustafson@whitecase.com
555 South Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone: (213) 620-7700

Keith H. Wofford (*pro hac vice forthcoming*)
kwofford@whitecase.com
W. Dylan Fay (SBN 344572)
wfay@whitecase.com
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33166
Telephone: (305) 371-2700

Sean Gorman (*pro hac vice forthcoming*)
sgorman@whitecase.com
609 Main Street, Suite 2900
Houston, TX 77002
Telephone: (713) 496-9700

Stephen Moeller-Sally (*pro hac vice forthcoming*)
ssally@whitecase.com
75 State St.
Boston, MA 02109
Telephone: (617) 979-9300

Attorneys for Plaintiff,
*CELSIUS NETWORK LIMITED*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CELSIUS NETWORK LIMITED, | Case No.: 3:25-cv-8966 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| ARCHBLOCK, INC., TRUSTTOKEN, INC., AND TRUECOIN LLC, | |
| Defendants. | |

1    Plaintiff, Celsius Network Limited ("Celsius"), sues Defendants Archblock, Inc.

2    ("Archblock"), TrustToken Inc. ("TrustToken"), and TrueCoin LLC ("TrueCoin"), and alleges as f

3    ollows.

**INTRODUCTION**

5    1.    This case arises from a deliberate multi-million-dollar fraud in the volatile and

6    speculative world of cryptocurrency.  Defendants pledged to bring safety and stability to that

7    market.  They promised customers that their deposits would be held securely and risk-free by

8    "fiduciary partners" in cash or cash-equivalent, highly liquid investments.  Instead, Defendants

9    gambled their customers' deposits on risky offshore investments with partners who disclaimed any

10   fiduciary duties.  When Celsius sought the return of the funds it had entrusted to Defendants, they

11   refused.  As a result of Defendants' fraudulent conduct, thousands of Celsius's creditors and

12   customers have been deprived of the value of property that rightly belongs to Celsius.

13   2.    To understand the scope of Defendants' fraud requires an explanation of the type of

14   digital asset they offered and its intended function within the cryptocurrency market.  In the

15   cryptocurrency world, digital assets are commonly referred to as "tokens," which represent units of

16   value exchanged in cryptocurrency markets.  Some tokens, such as Bitcoin or Ethereum, fluctuate

17   in price based on market demand and speculation, while others are designed to maintain a constant

18   value. These latter tokens, known as "stablecoins," are intended to remain "pegged" to a reference

19   asset—usually a major fiat currency—so that each coin trades at one dollar, one Euro, one British

20   pound, or an equivalent currency.  Stablecoins typically maintain their "peg" by keeping on hand

21   cash or cash equivalents of the relevant fiat currency in an amount equal to the number of

22   stablecoins outstanding.  Stablecoins are useful because they allow people to transact, lend, and

23   trade on cryptocurrency exchanges using a digital asset that functions as a stable, fiat-currency-

24   equivalent medium of exchange, without converting in and out of traditional bank accounts (and

25   incurring the associated exchange costs).

26   3.    At the time of the events giving rise to these claims, Celsius was a cryptocurrency

27   platform that offered interest-bearing accounts, loans, and other investment products involving

28   digital assets.   Celsius allowed customers to deposit cryptocurrencies—including Bitcoin,

Ethereum, and various stablecoins—in exchange for promised yields.  At its peak, Celsius held billions of dollars in customer deposits and operated globally as one of the largest cryptocurrency platforms in the world.  Celsius and certain of its affiliates commenced cases under chapter 11 of the United States Bankruptcy Code in July 2022 (the "Celsius Chapter 11 Cases") following liquidity problems and a collapse in digital asset prices.

4.      Celsius and other cryptocurrency platforms often purchased or used stablecoins as a digital substitute for cash, to facilitate transfers, collateralize transactions, and manage liquidity. Celsius also accepted transfers of stablecoins from its customers who wanted to use stablecoins in connection with Celsius's services.  But a stablecoin is useful for those purposes only if it remains pegged to its fiat currency—that is, only so long as one "coin" is worth one "dollar," for example. The reliability of a stablecoin's value and the accuracy of the issuer's representations about its reserves are therefore critical to such market participants.

5.      Defendants, a conglomerate of stablecoin issuers and providers, described themselves as "The Future of Finance for All."[1]  They promised the "world's most transparent stablecoin," "[t]rusted by the world's leading businesses."  Most importantly, they represented to their customers that their "stablecoins are fully collateralized, held in third-party escrow" and redeemable on demand.  Those statements were false.  But in reliance on these and other misrepresentations in Defendants' terms and conditions, Celsius deposited millions of dollars with Defendants.  When Defendants gambled those deposits on speculative investments and risky partners, it was Celsius—and its thousands of customers—who lost.

6.      Defendants did not back their stablecoins one-to-one with fiat currency as they promised.  They did not keep customers' money in safe, liquid investments, as promised.  And they did not deposit customers' funds in escrow accounts with reliable fiduciary partners, as promised. In fact, one of Defendants' "escrow partners," Prime Trust LLC ("Prime Trust"), has stated in court proceedings that it resigned as an escrow agent in 2019.  And Prime Trust was placed in receivership in July 2023 for misappropriation of client funds and filed for bankruptcy in August

---

[1] The statements in this paragraph were present on the trusttoken.com website as of June 2021. *See* WayBack Machine, web.archive.org/web/20210618150532/https://www.trusttoken.com/.

2023.  A second, First Digital Trust, lost access to certain client funds because of a defaulted investment that was not made in cash, cash equivalents or short-term government securities.

7.     As a result of Defendants' misrepresentations and failure to maintain proper protections for their customers' property, Celsius has been unable to redeem stablecoins issued by Defendants worth approximately USD $12.92 million.[2]  Celsius brings these claims to recover the funds deposited with and lost by Defendants for the benefit of thousands of its creditors and customers, pursuant to the terms of a confirmed plan of reorganization (the "Celsius Plan") in the Celsius Chapter 11 Cases.  The value recovered in this action will be returned for equitable distribution to creditors and customers in accordance with the terms of the Celsius Plan.

## THE PARTIES

8.     Plaintiff Celsius Network Limited is a limited company organized under the laws of England and Wales, acting by and through the Blockchain Recovery Investment Consortium LLC, as Complex Asset Recovery Manager and Litigation Administrator for Celsius Network LLC and its affiliated Post-Effective Date Debtors under the Celsius Plan.

9.     Defendant Archblock, Inc. is a Delaware corporation with its principal place of business in Burlingame, California.  It was formerly known as TrustLabs, Inc.

10.    Defendant TrustToken, Inc. is a Delaware corporation with its principal place of business in Burlingame, California.  It is wholly owned by Archblock, Inc., formerly known as TrustLabs, Inc.

11.    Defendant TrueCoin LLC is a Delaware limited liability company with its principal place of business in Burlingame, California.  Its sole member is Archblock, Inc., formerly known as TrustLabs, Inc.  Archblock, Inc. is a citizen of Delaware and California.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 exclusive of interest and costs and the parties are

---

[2] This amount is the US dollar equivalent of the foreign currencies underlying Celsius's TrueCurrency tokens as of the date of filing of this complaint.

completely diverse. Plaintiff is a citizen of the United Kingdom, and each Defendant (and, as to TrueCoin LLC, its sole member) is a citizen of Delaware and California.

13. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

14. The Court has general personal jurisdiction over each Defendant because each Defendant is "at home" in California, where their principal places of business are located. *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014).

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants are residents of California and at least one Defendant resides in the Northern District of California.

## DIVISIONAL ASSIGNMENT

16. Upon information and belief, a substantial part of the events or omissions giving rise to the claims alleged herein, including ongoing misrepresentations, occurred in San Mateo County, in which Defendants have their principal place of business, and in San Francisco County.

## FACTUAL ALLEGATIONS

### A. TrueCurrency Tokens and Celsius's Digital Assets Exchange

17. This case concerns stablecoins called "TrueCurrencies" issued by Defendants TrueCoin and TrustToken in exchange for deposits of money that was intended to remain the property of the token holders. TrueCoin and TrustToken initially conducted their business in TrueCurrency tokens under the brand "TrustToken."

18. Each TrueCurrency token reflected the right to receive the return of a unit of the corresponding fiat currency on a one-to-one basis. For example, each TrueGBP token ("TGBP") reflected the right to receive the return of one Great British pound from the corresponding escrow account. The tokens Defendants issued included: TGBP, TrueAUD, a stablecoin purported to be backed one-to-one by Australian dollar reserves ("TAUD"), TrueCAD, a stablecoin purported to be backed one-to-one by Canadian dollar reserves ("TCAD"), and TrueHKD, a stablecoin purported to be backed one-to-one by Hong Kong dollars.

19. TrueCurrency tokens were obtained by depositing money with TrueCoin. As explained further below, TrueCoin and its affiliates promised that those funds would be maintained

- 4 -

in escrow accounts with independent fiduciaries and invested only in cash or liquid cash equivalents. The money in the escrow accounts was to remain the property of token holders and not to become the property of TrueCoin, TrustToken or the escrow holders.

20.    Prior to the commencement of the Celsius Chapter 11 Cases on July 13, 2022, Celsius and its affiliates operated, among other businesses, a digital asset exchange serving retail and institutional customers. TrueCurrency tokens issued by and through the Defendants were among the numerous cryptocurrencies traded on Celsius's exchange.

21.    Celsius currently holds 4,500,298.53 TAUD, 2,327,436.34 TCAD, and 6,229,711.59 TGBP issued by and through Defendants TrueCoin and TrustToken, which it has been unable to redeem for over two years.

### B.    Defendants' Website Misrepresentations

22.    From on or around November 21, 2020, through at least May 4, 2023,[3] the TrustToken website (www.trusttoken.com) belonging to Defendants contained certain representations on its main page and products page regarding its TrueCurrencies, with minor or no variation during this period. Representations on TrustToken's website included:

- "Our stablecoins are fully collateralized, held in third-party escrow, and subject to live, independent on-chain attestations"

- "Fully Collateralized. Every TrueCurrency is 100% collateralized, with funds held in escrow by our custody partners"

- "Easily Mint & Redeem. Near-instant mints and redemptions powered by PrimeX and the Silvergate Exchange Network"

23.    The TrustToken Website contained a "TrustToken Terms of Use" that was last modified on November 20, 2020. The TrustToken Terms of Use were entered into by and between the customer and "TrustToken, Inc. ('Company,' 'TrustToken,' 'we,' 'our,' or 'us')" and "govern[ed] [the customers'] access to and use of the Website[.]" "Website" is defined as "www.trusttoken.com."

---

[3] These dates are based on a review of internet archives for the TrustToken Website.

24.     The products page of the TrustToken Website contained a link to "TrueCurrencies Live Attestations" (https://real-time-attest.trustexplorer.io/trusttoken), which redirected the user to the website of the Defendants' purported independent auditor.  The auditor also posted "Real-Time Attest" reports to this website, purporting to show the "escrowed fiat" backing the TrueCurrencies at any given time and the percentage collateralization for each type of TrueCurrency token.  The attestation reports showed that the TrueCurrency tokens were no less than 100% collateralized during this period.

25.     In September 2022, the Defendants rebranded their business and adopted "Archblock" as their new brand name.

26.     After the rebranding, the Archblock website (www.archblock.com) (the "Archblock Website") made the following statements through at least August 10, 2023:[4]

- "Fully Collateralized. Every TrueCoin is 100% collateralized, with assets held in escrow by our custody partners."

- "Easily Mint & Redeem. Near-instant mints and redemptions, powered by PrimeX."

27.     The Archblock Website contained a "real-time reserve balance dashboard" on its TrueCoin page (https://www.archblock.com/truecoin) that provided the collateral ratios between the token supply and escrowed collateral for each TrueCurrency.  The real-time reserve balance represented that the TrueCurrencies were fully collateralized during this period.

28.     During the time that Celsius maintained deposits at Archblock and used its services, the Archblock Website contained an "Archblock Terms of Use." The Archblock Terms of Use were entered into by and between the customer and "Archblock, Inc. ('Company,' 'Archblock,' 'we,' 'our,' or 'us')" and "govern[ed] [the customers'] access to and use of the Website[.]" "Website" is defined as the Archblock Website.

**C.      The Launch of Foreign Currency-Backed TrueCurrency Tokens**

29.     Celsius first opened an account with TrustToken in 2019.  Celsius submitted an onboarding application in April 2019 and had its account approved in June 2019.

---

[4] The August 10, 2023 date is based on a review of internet archives for the Archblock Website.

30.    Prior to April 2, 2019, TrustToken's sole TrueCurrency token was TUSD.  During the ensuing three months, TrustToken launched its TGBP, TAUD and THKD tokens.

31.    A copy of the 2019 TrueCoin Terms of Use, modified to reflect the launch of TrustToken's foreign currency-backed TrueCurrency tokens, is attached as **Exhibit 1**.

32.    At this time, the TrueCoin Terms of Use included several representations regarding the liquidity, stability and security of TrueCurrency tokens.  Specifically, the Terms of Use represented that holders of TrueCurrency tokens could "redeem them for the respective fiat currency backing the tokens on the Platform."  The Terms of Use further represented that "TrueCurrency tokens are fully backed by the currency used to purchase them at issuance, cash equivalents or short-term government securities denominated in the same underlying fiat currency" and that the "respective fiat currencies [were] held in escrow accounts managed by our independent fiduciary network."  Finally, the Terms of Use also represented that TrueCoin "used TrustToken's asset tokenization smart contracts and escrow accounts managed by banks, depository institutions, or trust companies . . . to maintain a 1 to 1 parity between the TrueCurrency tokens and the fiat currencies, cash equivalents or short-term government securities held in escrow accounts for the benefit of our users."

33.    Celsius relied on these representations and on similar statements subsequently made by Defendants in their website, their communications, and their terms of use in deciding to enter into the transactions described in this Complaint.  Celsius would not have done so if it knew that Defendants' representations were false.  In particular, Celsius would not have onboarded with TrustToken and engaged in transactions involving TrueCurrency tokens if it knew that TrueCurrency tokens were not stablecoins backed by the subject fiat currencies on a one-to-one basis, or if it knew that its deposits of money with Defendants would not actually be kept with trusted fiduciary escrow partners, or if it knew that its deposits would not be kept in cash or cash-equivalents.

1

**D.** **Celsius's 2021 Redemption of TrueCurrency Tokens**

2 34. In early 2021, Celsius decided to redeem a pool of TrueCurrency tokens consisting

3 of TAUD, TCAD, TGBP and THKD.  Celsius encountered difficulties redeeming its TrueCurrency

4 tokens through the website and sought assistance from the TrustToken team.

5 35. Ultimately, TrustToken decided to have Celsius tender the TrueCurrency tokens to

6 the applicable burn address in accordance with the normal redemption process,[5] and TrustToken

7 would coordinate directly with First Digital Trust, one of Defendants' independent fiduciary

8 partners, to convert the underlying foreign currencies to US dollars and to wire the US dollar

9 proceeds to Celsius.

10 36. Celsius tendered approximately 4.89 million TAUD, 1.25 million TCAD, 20 million

11 THKD and 6.56 million TGBP for over USD $16 million in proceeds.  This redemption transaction

12 was consummated on or about April 21, 2021.

13 **E.** **Celsius Renews Its Onboarding Application and Agrees to the TrueCoin Terms**

14   **of Use**

15 37. In 2021, TrustToken requested an update of Celsius's know-your-customer

16 information.  TrustToken required Celsius to submit a new TrustToken Entity Onboarding

17 application with certain missing supporting documentation.

18 38. On June 16, 2021, Celsius executed the TrustToken Entity Onboarding application

19 in order to maintain its account with TrustToken for the purchase and redemption of TrueCurrency

20 tokens.

21 39. By executing the Entity Onboarding application, Celsius's Chief Investment

22 Officer, Harumi Urata-Thompson certified that she had "read and agree[s] to TrueCoin's Terms of

23 Use and Privacy Policy."  The TrueCoin Terms of Use formed a binding contract between TrueCoin

24 and Celsius.

25

26

---

27 [5] A burn address is a cryptocurrency wallet address that no one controls, used to permanently
28 remove tokens from circulation by sending them to an unrecoverable destination on the
blockchain.

1      **F.      Defendants' Misrepresentations in Their Terms of Use**

2          40.      A copy of the TrueCoin Terms of Use in effect from November 12, 2020 until at

3    least November 6, 2023 is attached as **Exhibit 2**.

4          41.      By their terms, the TrueCoin Terms of Use were between Celsius and TrueCoin,

5    which is defined as "Company," "TrueCoin," "we," "our," or "us."    The TrueCoin Terms of Use

6    state that customers "consent to these Terms by [their] use of [TrustToken's] website and

7    TrueCoin's services."

8          42.      The TrueCoin Terms of Use made multiple representations regarding (i) the ability

9    to redeem TrueCurrencies, (ii) the collateralization or "backing" of each TrueCurrency, and (iii)

10   the reputation and qualities of the third parties who are purportedly "escrowing" the TrueCurrencies

11   and underlying fiat currency.  These representations included:

12          •    "The Platform is an online environment to mint TrueUSD, TrueGBP, and other

13              stable  cryptocurrency  tokens  (each  a  "TrueCurrency"  and  collectively

14              "TrueCurrencies") for US Dollars, British Pounds Sterling, and other fiat currencies,

15              respectively.  You may also redeem TrueCurrency tokens for the respective fiat

16              currency on the Platform."

17          •    "Once you have TrueCurrency tokens, you can trade them, keep them, or use them

18              to pay persons that will accept your TrueCurrency tokens, or redeem them for the

19              respective fiat currency backing the tokens on the Platform."

20          •    "TrueCurrency holders can mint or redeem tokens for their respective fiat currencies

21              held in escrow accounts managed by our independent fiduciary network through the

22              Platform. The Platform is only intended to facilitate such mints and redemptions."

23          43.      The TrueCoin Terms of Use also made the following representations regarding the

24   collateralization or "backing" of the TrueCurrencies:

25          •    "TrueCurrency tokens are fully backed by the currency used to mint them at

26              issuance, cash equivalents, short-term government securities, or liquid investments

27              denominated in the same underlying currency."

28

- "[TrueCoin] works with independent third-party financial institutions to provide cash management for the fiat deposits backing TrueCurrency tokens so that each TrueCurrency token is backed by an equivalent amount of fiat deposits, cash equivalents, short-term government treasuries, or liquid investments."

44.    The TrueCoin Terms of Use make the following representations regarding the reputation and qualities of the third parties who purportedly "escrowed" the TrueCurrencies and underlying fiat currency:

- "TrueCurrency holders can mint or redeem tokens for their respective fiat currencies held in escrow accounts managed by our independent fiduciary network through the Platform."

- "[TrueCoin] utilizes TrustToken's asset tokenization smart contracts and escrow accounts managed by banks, depository institutions, or trust companies (each a 'Banking Partner' and together our 'Banking Partners') in order to maintain 1 to 1 parity between TrueCurrency tokens and the fiat currencies, cash equivalents, or short-term government securities, or liquid investments held in escrow accounts for the benefit of our users."

- "In order to cause TrueCurrency tokens to be issued or redeemed by the Company, you must be a verified customer of the Company. You must create an account on the Platform and pass any bank verifications and KYC/AML validation requirements that we or our independent fiduciary partners require."

**G.      Celsius Continues to Rely on Defendants' Misrepresentations as it Makes Additional Transactions.**

45.    In the latter half of 2021, Celsius and TrustToken explored an expanded business relationship involving another TrustToken product, TrueFi. TrueFi was a "decentralized finance" protocol for lending cryptocurrency tokens. In contrast to collateralized lending platforms, on which borrowers would need to lock up cryptocurrency tokens to secure their borrowings, TrueFi allowed its stakeholders to lend and borrow on an uncollateralized basis. The protocol was

managed through the TRU token.  Participants that deposited cryptocurrency tokens into the lending pool received TRU tokens that could be used to vote on requests for loans from the pool.

46.    In connection with its exploration of a potential listing of the TRU token on the Celsius exchange, Celsius undertook a review of TrustToken's products, including TrueCurrencies and TrueFi.  As part of the diligence, in November 2021, Celsius employees examined and relied on public statements in which TrustToken and TrueCoin represented that:

- "TrueCurrency tokens are fully backed by the currency used to mint them at issuance."

- "TrueCurrency holders can mint or redeem tokens for their respective at currencies held in escrow accounts managed by our independent fiduciary network through the Platform."

- "TrueFi works with independent third-party financial institutions to provide cash management for the fiat deposits backing TRU tokens."

- "TrueFi publish their audit reports on their website"

47.    Included in Defendants' email to Celsius was a link to a highlighted version of the TrueCoin Terms of Use, specifically identifying the above representations.

48.    In early 2022, in reliance on Defendants' ongoing representations about the liquidity, stability and security of TrueCurrency tokens, Celsius decided to mint a substantial quantity of TAUD, TCAD, TGBP and THKD.  Over a period of several months, Celsius encountered difficulties and delays in minting the TrueCurrency tokens through the TrustToken website and sought assistance from the TrustToken team.

49.    On June 7, 2022, Celsius and TrustToken entered into a Cryptocurrency Purchase Agreement, pursuant to which Celsius could mint TrueCurrency tokens through TrustToken "over-the-counter."  Under the Purchase Agreement, Celsius was entitled to place orders with TrustToken.  Upon confirmation of an order by TrustToken, Celsius was obligated to transfer funds to TrustToken, and TrustToken was obligated to deliver the TrueCurrency tokens to Celsius.

50.    Celsius was induced to enter into the Cryptocurrency Purchase Agreement by Defendants' misrepresentations regarding the TrueCurrency tokens.

51.     On or about June 9, 2022, Celsius transferred USD $14,543,958.10 to a TrueCoin account as funds to back the minting of 5,210,000 TAUD, 1,435,000 TCAD and 7,690,000 TGBP.

**H.      Defendants Refuse to Redeem Celsius's TrueCurrency Tokens on Demand.**

52.     On March 23, 2023, Celsius emailed a redemption request to TrustToken, seeking to redeem certain holdings of TAUD, TCAD, TGBP and THKD for US dollars. The request noted that Celsius had previously been able to mint and redeem coins directly through TrustToken, and that Celsius hoped to accomplish the current redemption by the same means.

53.     Archblock responded nearly a month later asking whether the redemption request was made by a person properly authorized to act on behalf of Celsius. Celsius's CEO promptly provided the requested confirmation. Still unsatisfied, Archblock imposed additional hurdles to the redemption, despite Celsius's right under the Terms of Use to redeem its tokens on demand. Archblock asked for additional evidence of authorization in the form of a secretary's certificate or similar formal document certifying authority to act on the matter. Archblock also demanded evidence of court approval for Celsius's ability to redeem the TrueCurrency and a list of assets sought to be redeemed.

54.     On June 30, 2023, the Bankruptcy Court in the Celsius Chapter 11 Cases entered a stipulation and order authorizing Celsius to sell or convert certain cryptocurrency tokens from and after July 1, 2023 (the "Conversion Order").

55.     On July 11, 2023, Celsius sent the requested authorization certificate and a copy of the Conversion Order to Archblock to satisfy Archblock's request for evidence of authorization.

56.     On July 20, 2023, Celsius requested a call to discuss the redemption of the TrueCurrency tokens.

57.     In response, on July 21, 2023, Archblock informed Celsius that GBP, CAD and AUD funds were inaccessible for redemption because Prime Trust LLC, one of Archblock's alleged fiduciary partners, had been placed into receivership in Nevada. Archblock made this statement in full knowledge that not all of the GBP funds backing the TGBP coins were deposited with Prime Trust. A substantial amount of those funds was held by First Digital Trust, another of the Defendants' fiduciary partners.

58. For more than two years, Celsius has been unable to redeem TrueCurrency tokens currently worth approximately USD $12.92 million, which Defendants represented were backed by foreign currency reserves held by Prime Trust and First Digital Trust as fiduciaries and escrow agents.

**I.  Prime Trust's Collapse Impairs Defendants' Fiat Currency Reserves.**

59. On June 21, 2023, the Nevada Financial Institutions Division ("NFID") issued a cease-and-desist order against Prime Trust, one of Defendants' fiduciary partners, requiring it stop accepting fiat currency and cryptocurrency from existing and new customers.

60. The cease-and-desist order stated that Prime Trust was unable to honor customer withdrawals due to a shortfall in customer funds and that Prime Trust materially and willfully breached its fiduciary duties to its customers by failing to safeguard assets under its custody.

61. On July 14, 2023, the Eighth Judicial District Court for the State of Nevada entered an order appointing a receiver over Prime Trust and its affiliates.

62. On August 12, 2023, Prime Trust and its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Prime Trust Chapter 11 Cases").

63. On October 20, 2023, under penalty of perjury, TrueCoin filed a proof of claim in the Prime Trust Chapter 11 Cases, a copy of which is attached as **Exhibit 3**. In its proof of claim, TrueCoin asserted that funds it deposited into escrow accounts at Prime Trust – including accounts holding foreign currency backing TAUD, TCAD and TGBP tokens – were property of the TrueCurrency token holders (of which Celsius was the largest) and not property of either the Prime Trust estate or of TrueCoin. In reference to an Escrow Services Agreement by and between TrueCoin and Prime Trust (the "2019 Escrow Agreement"), TrueCoin stated in its Proof of Claim:

> Pursuant to the parties' agreements, Prime Trust held and managed the funds deposited into the Escrow Accounts "as a fiduciary" and "for the benefit of" the Holders. Further, "no amounts deposited into the Escrow Account shall become the property of Company [TrueCoin], Prime Trust, or any other entity, or be subject to any debts, liens or encumbrances of any

- 13 -

1               kind of Company, Prime Trust, or any other entity, as they are held

2               exclusively for the benefit of Holders.

3   In the alternative, TrueCoin asserted on behalf of the TrueCurrency token holders a claim for the

4   full amount of foreign currencies held in the escrow accounts.

5         64.    On November 13, 2023, the Prime Trust debtors moved to sell certain foreign

6   currency backing the Defendants' TAUD, TCAD and TGBP tokens (the "Foreign Currency Sale

7   Motion"). The Prime Trust debtors asserted that the governing agreements between Prime Trust

8   and TrustToken established a debtor-creditor relationship, meaning that the foreign currency was

9   property of the Prime Trust estate and could be sold for the benefit of all of its creditors.

10        65.    On November 27, 2023, TrustToken and TrueCoin filed an opposition to the Foreign

11   Currency Sale Motion (the "Opposition"), in which they explained that the foreign currency

12   deposits were held in escrow accounts in the name TrueCoin for the benefit of TrueCurrency token

13   holders. Further, TrustToken and TrueCoin argued that those deposits were governed by the 2019

14   Escrow Agreement, which established a true escrow, in which Prime Trust and TrueCoin had

15   disclaimed any interest.

16        66.    Evidence presented in the Prime Trust Chapter 11 Cases reveals that Defendants'

17   assurances to customers (including Celsius) that funds backing TrueCurrency tokens were

18   maintained in "escrow accounts" with "fiduciary partners" were false. For example, in reply to the

19   Opposition, Prime Trust submitted an October 2019 letter in which Prime Trust purports to have

20   resigned as escrow agent and terminated the 2019 Escrow Agreement. Further, in support of the

21   Foreign Currency Sale Motion itself, Prime Trust submitted a May 2022 Order Form update

22   executed by TrustToken that subjected TrustToken and its affiliates to the terms of a Master

23   Services Agreement, which, by its terms, did not contemplate any fiduciary or escrow relationship

24   and permitted Prime Trust to use customer funds for its own purposes. The Order Form further

25   provided that the Master Services Agreement superseded all other agreements with TrustToken and

26   its affiliates. TrustToken and TrueCoin claim that Prime Trust represented that execution of the

27   Order Form would not affect any escrow arrangements between TrustToken and Prime Trust. But

28   the plain text of the Order Form argues otherwise. Lastly, in the reply to the Opposition, Prime

1    Trust also submitted copies of 2022 User Agreements executed by TrueCoin and Prime Trust,

2    which purport to permit Prime Trust to commingle fiat currencies.

3           67.    This evidence makes clear that Defendants did not ensure that Celsius's deposits

4    were held in a safe escrow held by a fiduciary, as they promised on their website, in their Terms of

5    Use, and in their communications with Celsius. By signing the Order Form and the 2022 User

6    Agreements, with full knowledge that Prime Trust had tendered its resignation as escrow agent in

7    2019, Defendants demonstrated the falsity of their representations regarding the liquidity, stability

8    and safety of the customer funds backing TrueCurrency tokens.

9           68.    The Plan Administrator of Prime Trust, appointed pursuant to a confirmed plan of

10   reorganization in the Prime Trust Chapter 11 Cases, maintains that the foreign currency deposits

11   (millions of dollars of which belong to Celsius) are subject to the Master Service Agreement with

12   Prime Trust and are not held in a true escrow.  As a result of Defendants' misrepresentations and

13   improper actions, Celsius cannot recover any of its foreign currency deposits held by Prime Trust.

14          **J.      First Digital Trust's Malfeasance Impairs Defendants' Fiat Currency Reserves.**

15          69.    On March 26, 2024, Alex de Lorraine, the CEO of Archblock, sent an email alerting

16   Celsius to "potential issue concerning the collateral backing the TGBP stablecoin."  That collateral

17   included money deposited by Celsius.  Mr. de Lorraine explained that "some of the investments

18   have not been returned within the contracted time frame" and that Archblock "suspect[ed] a

19   potential default by an underlying investment fund."

20          70.    Upon information and belief, the cash collateral referred to in Mr. de Lorraine's

21   communication was deposited by Defendants with First Digital Trust, ostensibly in escrow as

22   promised by TrueCoin's Terms of Use.

23          71.    Based on Mr. de Lorraine's communication, the Great British pounds that were

24   collateral for TGBP held by Celsius were invested with an investment fund and not in cash, cash

25   equivalents or short-term government securities and not in escrow accounts, as promised, and

26   further, that Defendants had placed Celsius's funds in vehicles with a "contracted time frame,"

27   contrary to Defendants' representations regarding the liquid nature of the underlying fiat currency

28   investments.

72.     Upon information and belief, the Defendants have commenced legal proceedings against First Digital in an attempt to recover the missing fiat currency.

73.     To date, Celsius has been unable to redeem all the TGBP tokens it holds that are backed by money deposited with First Digital Trust.  Further, the Defendants have refused to share any information with Celsius about its efforts to recover the underlying funds or to allow Celsius to participate in those efforts, despite knowing that the funds belong to Celsius.

**K.     The SEC's Investigation of TrueCoin and TrustToken's False and Misleading Claims.**

74.     In September 24, 2024, the Securities and Exchange Commission initiated an action against TrueCoin and TrustToken, alleging that they made false and misleading statements with respect to US dollar-backed TrueCurrency tokens known as TrueUSD ("TUSD").

75.     According to the SEC, TrueCoin and TrustToken "became aware of the redemption problems" with TUSD by "the fall of 2022" based on internal correspondence between officers at the TrustToken, TrueCoin, and First Digital Trust.

76.     The SEC alleged that defendants "falsely claim[ed] that TUSD was backed '1:1' by U.S. dollars" when, in reality, TrueCoin and TrustToken had "invested a substantial portion of the assets purportedly backing TUSD . . . in a speculative and risky offshore commodity fund."  This allegation corresponds strikingly to Mr. de Lorraine's admission that the fiat currency backing certain TGBP tokens was compromised due to a default by an underlying investment fund.

77.     The SEC cited links on the TrustToken Website to "attestation reports" that "misleadingly indicated that the TUSD reserves exceeded the amount of TUSD outstanding" and that failed to disclose "the increasingly risky nature of investing the assets backing TUSD."  As discussed above, the Defendants posted similar attestation reports with respect to the foreign currency-backed TrueCurrency tokens.

**L.     Celsius Timely Files These Claims.**

78.     Celsius and Defendants entered into a tolling agreement on June 4, 2025, which tolled the statutes of limitations on all claims between the parties for the duration of that agreement. Under the parties' agreement, any applicable period under a statute of limitations, statute of repose

or other time-based limitation or defense shall be extended by one day for each day in the tolling period. The parties' tolling agreement expired on October 2, 2025.

## FIRST CAUSE OF ACTION

### FRAUD – INTENTIONAL MISREPRESENTATION

#### (Against all Defendants)

79.     Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

80.     Beginning on November 12, 2020 and continuing at least through August 10, 2023, Defendants made an ongoing misrepresentation to Celsius in their respective websites, communications, and/or Terms of Use that TrueCurrency Tokens were redeemable upon demand, and thus that Celsius could and would be able to obtain the return of the money deposited to back its TrueCurrency tokens upon the submission of its TrueCurrency tokens for redemption. That representation was false, because Defendants have failed to return the funds deposited to back certain of Celsius's TrueCurrency tokens for a period of over two years. Defendants knew this representation was false when it was made, and/or made the representation recklessly and without regard for its truth, including because they knew the money deposited to back TrueCurrency tokens would be invested in illiquid or risky investments, because they knew that Prime Trust had tendered its resignation as escrow agent, and because they executed agreements with Prime Trust that were not true escrow agreements, in each case creating a substantial risk of causing a loss that would prevent the return of Celsius's money.

81.     Beginning on November 12, 2020 and continuing at least through August 10, 2023, Defendants also made an ongoing misrepresentation to Celsius in their respective websites, communications, and/or Terms of Use that TrueCurrency tokens were fully backed by the money used to acquire the tokens and that a one-to-one parity existed, and Defendants ensured that a one-to-one parity was maintained, between the TrueCurrency tokens and the underlying currency. That representation was false, including because a one-to-one parity was not maintained and Defendants have failed to return the funds backing certain of Celsius's TrueCurrency tokens for a period of over two years. Defendants knew that representation was false, and/or made the representation

- 17 -

recklessly and without regard for its truth, including because they knew that the money deposited to back TrueCurrency tokens would be invested in illiquid or risky investments, because they knew that Prime Trust had tendered its resignation as escrow agent, and because they executed agreements with Prime Trust that were not true escrow agreements, in each case creating a substantial risk of causing a loss that would result in insufficient collateralization. Defendants also knew this representation was false, and/or made the representation recklessly and without regard for its truth, including because one of their fiduciary partners, Prime Trust, admitted to a shortfall in customer funds and another of their fiduciary partners, First Digital Trust, lost access to Celsius's funds in a risky investment that defaulted.

82.     Beginning on November 12, 2020 and continuing at least through August 10, 2023, Defendants also made an ongoing misrepresentation to Celsius in their respective websites, communications, and/or Terms of Use that the money Celsius deposited to back the TrueCurrency tokens was and would be held in escrow accounts managed by fiduciaries that invested the funds in cash, cash equivalents, short-term government securities or liquid investments.     That representation was false, and Defendants knew that representation was false, and/or made the representation recklessly and without regard for its truth, including because they knew that the money deposited to back TrueCurrency tokens would be invested in illiquid or risky investments, not held in escrow accounts managed by fiduciaries. Defendants' representation was false, and Defendants knew the representation was false and/or made the representation recklessly and without regard for its truth, including because they knew that Prime Trust had tendered its resignation as escrow agent and because Defendants executed agreements with Prime Trust that were not true escrow agreements and purported to permit Prime Trust to commingle fiat currency. That representation was also false, and Defendants knew the representation was false and/or made the representation recklessly and without regard for its truth, including because Defendants permitted First Digital Trust to invest Celsius's funds in a risky investment that defaulted. In each case, neither Prime Trust nor First Digital Trust acted as fiduciaries.

83.     Defendants knew that these ongoing representations were false or made these ongoing representations recklessly and without regard for their truth, including based on the facts alleged above.

84.     Defendants intended Celsius to rely on these ongoing representations and intended to induce Defendants into depositing funds with Defendants or purchasing TrueCurrency tokens from Defendants.

85.     Defendants' ongoing misrepresentations substantially influenced Celsius in its decision to purchase approximately $14.5 million in TrueCurrency tokens and to retain those tokens.

86.     Defendants' misrepresentations were material, because they addressed the central features of the product they were promoting: US dollar and foreign currency-backed stablecoins. Without Defendants' ongoing misrepresentations, Celsius would not have purchased $14.5 million in TrueCurrency tokens and retained those tokens.

87.     Celsius reasonably relied on Defendants' misrepresentations, because Defendants' statements were consistent with the nature of the product they were promoting: US dollar and foreign currency-backed stablecoins.

88.     Had Celsius known that Defendants' representations regarding redemption, one-to-one backing, escrow with fiduciary partners, or safe and liquid investments were false, Celsius would not have purchased or held TrueCurrency tokens.  Had Celsius discovered that these representations were false while it held TrueCurrency tokens, Celsius would have sought to redeem any tokens it held immediately.

89.     Celsius was harmed by Defendants' misrepresentations, including because Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired and/or its property lost.

90.     Celsius's reliance on Defendants' misrepresentations was a substantial factor in causing Celsius harm.

91.     Celsius has been damaged by Defendants' fraudulent statements in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### FRAUD – CONCEALMENT

### (Against all Defendants)

92.     Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

93.     Beginning on November 12, 2020 and continuing at least through August 10, 2023, Defendants made factual statements to Celsius but intentionally failed to disclose material facts, known to Defendants but not to Celsius and that Celsius could not have discovered, making Defendants' statements deceptive, including:

- Defendants' statements in their respective websites, communications, and/or Terms of Use that TrueCurrency Tokens were redeemable upon demand, and thus that Celsius could and would be able to obtain the return of the money deposited to back its TrueCurrency tokens upon the submission of its TrueCurrency tokens for redemption – when the true facts were (as known to Defendants but not to Celsius) that Celsius would not be able to redeem the TrueCurrency Tokens upon demand, or a significant risk existed that Celsius would not be able to redeem the TrueCurrency Tokens upon demand because, the money deposited to back TrueCurrency tokens would be invested in illiquid or risky investments, with a substantial risk of loss that would prevent the return of Celsius's money.

- Defendants' statements to Celsius in their respective websites, communications, and/or Terms of Use that TrueCurrency tokens were fully backed by the money used to acquire the tokens and that a one-to-one parity existed, and Defendants ensured that a one-to-one parity was maintained, between the TrueCurrency tokens and the underlying currency – when the true facts were (as known to Defendants but not to Celsius) that the money deposited to back TrueCurrency tokens would be invested in illiquid or risky investments, causing a substantial risk that of loss that would result in insufficient

collateralization; and that one of Defendants' fiduciary partners, Prime Trust, admitted to a shortfall in customer funds and, another of their fiduciary partners, First Digital Trust, lost access to Celsius's funds in a risky investment that defaulted.

- Defendants' statements to Celsius in their respective websites, communications, and/or Terms of Use that the money Celsius deposited to back the TrueCurrency tokens was and would be held in escrow accounts managed by fiduciaries that invested the funds in cash, cash equivalents, short-term government securities or liquid investments. In fact (as known to Defendants but not to Celsius) (i) the money deposited to back TrueCurrency tokens would be invested in illiquid or risky investments, not held in escrow accounts managed by fiduciaries that invested the funds in cash, cash equivalents, short-term government securities or liquid investments; (ii) Prime Trust had tendered its resignation as escrow agents; (iii) Defendants executed agreements with Prime Trust that were not true escrow agreements and purported to permit Prime Trust to commingle fiat currency, and (iv) Defendants permitted First Digital Trust to invest Celsius's funds in a risky investment that defaulted, and that neither Prime Trust nor First Digital Trust acted as fiduciaries.

94.     Celsius did not know of the above-identified concealed facts until after Celsius made its redemption request, which Defendants never honored.

95.     Defendants intended to deceive Celsius by concealing the above-identified facts.

96.     Defendants' concealments substantially influenced Celsius in its decision to purchase approximately $14.5 million in TrueCurrency tokens and to retain those tokens. Had the above-identified facts been disclosed by Defendants to Celsius, Celsius reasonably would have behaved differently, in that if Celsius would have known the concealed facts from inception, Celsius would not have purchased or held TrueCurrency tokens, and if Celsius had discovered the concealed facts while it held TrueCurrency tokens, Celsius would have sought to redeem any tokens it held immediately.

97.     Celsius was harmed by Defendants' concealments, in an amount to be determined at trial, including because Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired and/or its property lost.

98.     Because of Celsius's reliance thereon, Defendants' concealments were a substantial factor in causing Celsius harm.

## THIRD CAUSE OF ACTION

### FRAUD – FALSE PROMISE

### (Against all Defendants)

99.     Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

100.    Beginning on November 12, 2020 and continuing at least through August 10, 2023, Defendants made ongoing promises to Celsius in their respective websites, communications, and/or Terms of Use that:

- Celsius could and would be able to obtain the return of the money deposited to back its TrueCurrency tokens upon the submission of its TrueCurrency tokens for redemption;

- TrueCurrency tokens would remain fully backed by the money used to acquire the tokens and that a one-to-one parity existed and would continue to exist, and Defendants ensured and would continue to ensure that a one-to-one parity was maintained, between the TrueCurrency tokens and the underlying currency.

- The money Celsius deposited to back the TrueCurrency tokens was and would be held in escrow accounts managed by fiduciaries that invested the funds in cash, cash equivalents, short-term government securities or liquid investments

101.    Defendants did not intend to perform these promises when they made them, as evidenced by their knowledge including: knowledge that the TrueCurrency tokens could not necessarily be redeemed for the return of the money backing the tokens; knowledge that they were not ensuring that a one-to-one parity was maintained, between the TrueCurrency tokens and the underlying currency; knowledge that the money deposited to back TrueCurrency tokens would be

- 22 -

invested in illiquid or risky investments and not held in escrow accounts managed by fiduciaries that invested the funds in cash, cash equivalents, short-term government securities or liquid investments; knowledge that Prime Trust had tendered its resignation as escrow agent; knowledge that its agreements with Prime Trust were not true escrow agreements and purported to permit Prime Trust to commingle fiat currency; knowledge that neither of their fiduciary partners, Prime Trust and First Digital Trust, acted as fiduciaries and that Prime Trust admitted to a shortfall in customer funds and First Digital Trust lost access to Celsius's funds in a risky investment that defaulted.

102. Defendants intended Celsius to rely on these ongoing promises and intended to induce Defendants into depositing funds with Defendants or purchasing TrueCurrency tokens from Defendants.

103. Celsius reasonably relied on Defendants' promises in its decision to purchase approximately $14.5 million in TrueCurrency tokens and to retain those tokens.

104. Defendants did not perform in accordance with the ongoing promises, including:

- Defendants did not provide Celsius with the return of the money deposited to back its TrueCurrency tokens upon the submission of its TrueCurrency tokens for redemption;

- Defendants did not ensure that Celsius's TrueCurrency tokens remained fully backed by the money used to acquire the tokens and that a one-to-one parity existed and would continue to exist between the TrueCurrency tokens and the underlying currency.

- Defendants did not hold the money Celsius deposited to back the TrueCurrency tokens in escrow accounts managed by fiduciaries that invested the funds in cash, cash equivalents, short-term government securities or liquid investments.

105. Celsius was harmed by Defendants' false promises, in an amount to be determined at trial, including because Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired and/or its property lost.

1     106.    Celsius's reliance on Defendants' false promises was a substantial factor in causing

2    Celsius harm.

3                                  **FOURTH CAUSE OF ACTION**

4                                           **CONVERSION**

5                          **(Against TrueCoin and TrustToken)**

6     107.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein

7    in their entirety.

8     108.    By TrueCoin and TrustToken's own admissions, Celsius's TrueCurrency tokens

9    represent an ownership right to the foreign currency deposited with TrueCoin's fiduciary partners.

10    For example, in the Prime Trust Chapter 11 Cases, TrueCoin expressly claimed that the foreign

11    currency deposited with Prime Trust was not property of TrueCoin or Prime Trust, but the property

12    of Celsius and other holders of TrueCurrency tokens.

13     109.    Celsius has an ownership right in the foreign currency used to mint the TAUD,

14    TCAD and TGBP tokens it acquired in June 2022.  Celsius had a right to possess the foreign

15    currency deposited to back its TrueCurrency tokens on demand by presenting those tokens to

16    TrueCoin and TrustToken for redemption.

17     110.    TrueCoin and TrustToken substantially interfered with Celsius's property by

18    knowingly or intentionally (i) handing over possession of Celsius's foreign currency to Prime Trust

19    and First Digital Trust without appropriate escrow and fiduciary agreements; (ii) entering into

20    contracts with Prime Trust that purported to permit Prime Trust to commingle Celsius's foreign

21    currency, (iii) permitting First Digital Trust to invest Celsius's funds in a risky and now defaulted

22    investment, (iv) maintaining a relationship with Prime Trust, which had misappropriated customer

23    funds, and (v) failing to honor Celsius's requests for the return of its foreign currency.

24     111.    TrueCoin and TrustToken substantially interfered with Celsius's property by

25    knowingly or intentionally refusing to return the foreign currency deposited to back Celsius's

26    TrueCurrency tokens after Celsius demanded its return.

27     112.    Celsius did not consent to (i) TrueCoin's entry into contracts with Prime Trust that

28    purported to permit the commingling of Celsius's property; (ii) the investment of its funds in

1   anything other than cash, cash equivalents, short-term government securities or liquid investments;

2   (iii) the maintenance of its property with a party that violated applicable state law regulations and

3   misappropriated customer funds; (iv) TrueCoin and TrustToken's refusal to return Celsius's foreign

4   currency after Celsius demanded its return; or (v) any delay or frustration of its ability to receive

5   the return of Celsius's funds upon request.

6          113.    Celsius was harmed by TrueCoin and TrustToken's actions, because Celsius has not

7   been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired

8   and/or its property lost.

9          114.    TrueCoin and TrustToken's actions were a substantial factor in causing Celsius's

10  harm.

11         115.    Celsius has been damaged by TrueCoin and TrustToken's actions in an amount to

12  be determined at trial.

13                              **FIFTH CAUSE OF ACTION**

14                          **MONEY HAD AND RECEIVED**

15                        **(Against TrueCoin and TrustToken)**

16         116.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein

17  in their entirety.

18         117.    Through the Cryptocurrency Purchase Agreement and by other means, TrueCoin

19  and TrustToken received money from Celsius that was intended to be held in safekeeping for the

20  benefit of Celsius and returned to Celsius upon the tender of Celsius's TrueCurrency tokens to

21  TrueCoin and TrustToken.

22         118.    TrueCoin and TrustToken did not hold Celsius's money in safekeeping for Celsius's

23  benefit.  Instead, they gave possession of Celsius's money to Prime Trust and First Digital, causing

24  at least some of Celsius's money to be lost.  At least some of Celsius's money has been claimed as

25  the property of Prime Trust in its bankruptcy, and some has been lost in a risky and now defaulted

26  investment made by First Digital Trust.

27         119.    TrueCoin and TrustToken have not honored Celsius's request for the return of all of

28  the funds deposited to back its holdings of TrueCurrency tokens.

120.    Celsius has been damaged by TrueCoin and TrustToken's failure to return Celsius's money in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### GROSS NEGLIGENCE

### (Against TrueCoin and TrustToken)

121.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

122.    TrueCoin and TrustToken assumed a duty of care with respect to Celsius's money based on representations on their website or in communications with Celsius that (i) TrueCurrency tokens were fully backed by fiat currency deposits, cash equivalents, government-issued securities or other liquid investments, (ii) holders of TrueCurrency tokens could engage in redemption transactions at will, and (iii) that all foreign currency deposits were maintained in escrow accounts managed by third-party fiduciaries.

123.    TrueCoin and TrustToken breached this duty of care by, among other things, (i) maintaining a relationship, with and failing to monitor, Prime Trust, which resigned as escrow agent and misappropriated customer funds, (ii) entering into contracts with Prime Trust that purported to permit Prime Trust to commingle Celsius's foreign currency, (iii) failing to monitor First Digital Trust and permitting First Digital Trust to invest Celsius's funds in a risky and now defaulted investment, and (iv) failing to honor Celsius's requests for the return of its foreign currency.

124.    TrueCoin and TrustToken failed to exercise even scant care for Celsius's property. TrueCoin and TrustToken's failed to properly monitor the activities of its fiduciary partners and entered into agreements that were inconsistent with the promises TrueCoin and TrustToken made to Celsius regarding Celsius's property interests.

125.    TrueCoin and TrustToken's conduct was an extreme departure from the ordinary standard of conduct for parties that receive the property of others for safekeeping or that promise to maintain the property of others in safe escrow.

126.    TrueCoin and TrustToken's breach of their duty of care caused harm to Celsius, because Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired and/or its property lost.

127.    TrueCoin and TrustToken's breach of their duty of care was a substantial factor in causing Celsius harm.

128.    Celsius has been damaged by TrueCoin and TrustToken's actions in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(Against all Defendants)**

129.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

130.    Defendants made an ongoing representation to Celsius in their website or in communications with Celsius that TrueCurrency Tokens were redeemable upon demand, and thus that Celsius could obtain the return of the money deposited to back  its TrueCurrency tokens upon submission of its TrueCurrency Tokens for redemption.  That representation was not true, because Defendants took actions that caused the loss of some of that foreign currency and have failed to return the funds deposited to back certain of Celsius's TrueCurrency tokens for more than two years.

131.    Defendants also made an ongoing representation to Celsius in their website or in communications with Celsius that TrueCurrency tokens were fully backed by the cash used to acquire the tokens and that a one-to-one parity existed and Defendants ensured that a one-to-one parity was maintained between the TrueCurrency tokens and the underlying currency.   That representation was not true because Defendants took actions that caused the loss of some of that foreign currency, including permitting fiduciary partners to make investments other than in cash, cash equivalents or other safe liquid investment and executing agreements that purported to permit fiduciary partners to commingle fiat currency.  Defendants also knew or should have known that that representation was not true because one of their fiduciary partners, Prime Trust, had admitted

- 27 -

1  to a shortfall in customer funds and, another of their fiduciary partners, First Digital Trust, lost

2  access to Celsius's funds in a risky and now defaulted investment.

3         132.    Defendants also made an ongoing representation to Celsius in their website or in

4  communications with Celsius that the money Celsius deposited to back the TrueCurrency tokens

5  was held in escrow accounts managed by fiduciaries that invested the funds in cash, cash

6  equivalents, short-term government securities or liquid investments.  Defendants' representation

7  was not true, because they knew that Prime Trust had tendered its resignation as escrow agent and

8  because Defendants executed agreements with Prime Trust that were not true escrow agreements

9  and purported to permit Prime Trust to commingle fiat currency.  Defendants' representation was

10 also not true because they permitted First Digital Trust to invest Celsius's funds in a risky

11 investment that is now defaulted.  Neither Prime Trust nor First Digital Trust acted as fiduciaries.

12        133.    Defendants had no reasonable grounds to believe that these ongoing representations

13 were true while they made them, including because of their knowledge as to the investment of the

14 money deposited to back the TrueCurrency tokens in illiquid or risky investments, because of their

15 knowledge that Prime Trust had tendered its resignation as escrow agent, and because of their

16 knowledge that the money Celsius deposited to back TrueCurrency tokens was subject to

17 agreements that were not true escrow agreements and purported to permit the commingling of

18 funds.  For example, Defendants continued to make these representations even after they became

19 aware of significant problems at Prime Trust and First Digital, where a significant amount of the

20 foreign currency deposited to back TrueCurrency tokens was held.

21        134.    Defendants intended Celsius to rely on these ongoing representations.

22        135.    Defendants' ongoing representations substantially influenced Celsius in its decision

23 to purchase approximately $14.5 million in TrueCurrency tokens and to retain those tokens.

24        136.    Defendants' representations were material, because they addressed the central

25 features of the product they were promoting: US dollar and foreign currency-backed stablecoins.

26 Without Defendants' ongoing misrepresentations, Celsius would not have purchased $14.5 million

27 in TrueCurrency tokens and retained those tokens.

28

137.    Celsius reasonably relied on Defendants' representations, because their statements were consistent with the nature of the product they were promoting: US dollar and foreign currency-backed stablecoins.

138.    Celsius was harmed by Defendants' representations, because Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired and/or its property lost.

139.    Celsius's reliance on Defendants' representations was a substantial factor in causing Celsius harm.

140.    Celsius has been damaged by Defendants' representations in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against TrueCoin)

141.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

142.    The TrueCoin Terms of Use established a valid contract between TrueCoin and Celsius.

143.    In the TrueCoin Terms of Use, TrueCoin promised that Celsius could redeem its TrueCurrency tokens for the money deposited to back the tokens.  TrueCoin breached this promise by failing to return the funds deposited to back certain of Celsius's TrueCurrency tokens.

144.    In the TrueCoin Terms of use, TrueCoin also promised that Celsius's TrueCurrency tokens would be fully backed by the money deposited in exchange for the tokens and promised to ensure that a one-to-one parity was maintained between the TrueCurrency tokens and the underlying currency, which was to be held in escrow accounts.  TrueCoin breached that promise, by failing to ensure that Celsius's TrueCurrency tokens remained fully backed by the money deposited in exchange for the tokens or to ensure that a one-to-one parity was maintained between the TrueCurrency tokens and the underlying fiat currencies.  For example, one of TrueCoin's fiduciary partners, Prime Trust, has admitted to a shortfall in customer funds and another of

- 29 -

1    TrueCoin's fiduciary partners, First Digital Trust, lost access to Celsius's funds in a risky and now

2    defaulted investment.

3        145.    In the TrueCoin Terms of Use, TrueCoin also promised that the money Celsius

4    deposited to back the TrueCurrency tokens would be held in escrow accounts managed by

5    fiduciaries that would invest the funds in cash, cash equivalents, short-term government securities

6    or liquid investments.  TrueCoin breached that promise by executing agreements with Prime Trust

7    that were not true escrow agreements and that purported to permit Prime Trust to commingle fiat

8    currency.  TrueCoin also breached this promise by permitting First Digital Trust to invest Celsius's

9    funds in a risky investment that has now defaulted.

10        146.    Celsius was harmed by TrueCoin's breaches of the TrueCoin Terms of Use, because

11    Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's money deposited

12    with TrueCoin has been lost.

13        147.    TrueCoin's breaches were a substantial factor in causing Celsius harm.

14        148.    Celsius has been damaged by TrueCoin's breaches in an amount to be determined

15    at trial.

16    **<u>NINTH CAUSE OF ACTION</u>**

17    **BREACH OF FIDUCIARY DUTY**

18    **(Against All Defendants)**

19        149.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein

20    in their entirety.

21        150.    By virtue of its representations, agreements, and promises to act on behalf of and

22    for the benefit of Celsius, including through the representations, agreements, and promises alleged

23    above,  and because Celsius deposited funds into Defendants' control with the understanding that

24    they would act in accordance with their representations, agreements, and promises with regard to

25    the use of such funds, Defendants owed Celsius the fiduciary duties of loyalty and care and to deal

26    honestly and in good faith.

27        151.    Defendants breached these fiduciary duties, including by failing to return the funds

28    deposited to back certain of Celsius's TrueCurrency tokens; failing ensure that a one-to-one parity

- 30 -

was maintained between the TrueCurrency tokens and the underlying currency; and failing to ensure that the money Celsius deposited to back the TrueCurrency tokens was held in escrow accounts managed by fiduciaries with the funds being invested in cash, cash equivalents, short-term government securities or liquid investments.

152.    Defendants' breaches have proximately caused damages to Celsius, including because Celsius has not been able to redeem all its TrueCurrency tokens and Celsius's property interests have been impaired and/or its property lost.

153.    Celsius has been damaged by Defendants' breaches in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")

### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

### (Against all Defendants)

154.    Celsius incorporates paragraphs 1 – 78 of this Complaint as though set forth herein in their entirety.

155.    Defendants' conduct constitutes unlawful, unfair, and fraudulent business practices under the UCL.

156.    Celsius is a person that has suffered injury in fact and has lost money or property as a result of Defendants' unfair competition practices.

157.    **Unlawful:** Defendants' acts and practices were "unlawful" because they violated, among other laws, the California False Advertising Law, Bus. & Prof. Code § 17500 *et seq.*, and other statutory and common-law prohibitions against fraudulent and deceptive conduct.

158.    **Unfair:** Defendants' acts and practices were "unfair" because they offended established public policy and were immoral, unethical, oppressive, and unscrupulous, and because the harm caused by their conduct—misleading Celsius and the public about the safety, liquidity, and backing of their stablecoins—outweighed any alleged benefits.

159.   **Fraudulent:** Defendants' acts and practices were "fraudulent" because they were likely to deceive members of the public, including Celsius, regarding the safety, liquidity, and backing of Defendants' stablecoins and the security of funds entrusted to them.

160.   As set forth above, Celsius was in fact deceived and relied on Defendants' deceptions.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Celsius suffered injury in fact and lost money or property, including funds deposited with Defendants.

161.   Under California Bus. & Prof. Code § 17203, Celsius seeks restitution and other equitable relief necessary to restore to the post-effective Debtors' estate and its creditors all funds wrongfully obtained or retained by Defendants through their unfair and deceptive business practices.

### *Punitive Damages*

162.   Defendants' conduct was fraudulent, malicious, and oppressive within the meaning of California Civil Code § 3294, and Celsius seeks an award of punitive damages in connection with its claims for fraud, conversion and breach of fiduciary duty.   Defendants knowingly and intentionally misrepresented and concealed material facts and made materially false promises concerning the safety, liquidity, and backing of their stablecoins and the funds entrusted to them by Celsius and other customers.

163.   Defendants' misrepresentations, concealments and false promises were intentional and concealed material facts known to Defendants with the intention on the part of Defendants to deprive Celsius of property or legal rights, causing Celsius injury.

164.   Defendants' misrepresentations, concealments, and false promises were made with the intent to induce reliance by Celsius.

165.   Defendants acted with conscious disregard for the substantial risk of harm that their misrepresentations would cause.   Defendants' actions were willful, deliberate, and undertaken in reckless disregard of the truth and the financial injury likely to result.

AMERICAS 131329710

166.    Defendants' conduct constituting malice, oppression, or fraud was committed by or authorized by one or more officers, directors, or managing agents of each Defendant, who acted on behalf of their respective entities.

167.    In addition, one or more officers, directors, or managing agents of each Defendant knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.  For example, Mr. de Lorraine, who was an officer of Defendants during all relevant periods, was aware of the ongoing misrepresentations on Defendants' website and did not correct the misrepresentations.

168.    Accordingly, Celsius seeks an award of punitive and exemplary damages against Defendants in an amount sufficient to punish Defendants and to deter them and others from engaging in similar wrongful conduct in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Celsius Network Ltd. prays for judgment against Defendants as follows:

A. Judgment in favor of Celsius on each of its claims;

B. For an award of actual damages equal to the U.S. dollar value, as of the date of judgment, of the foreign currency corresponding to Celsius's holdings of TrueCurrency tokens, assuming a one-to-one parity between TrueCurrency tokens and the corresponding foreign currency;

C. For an award of restitution and disgorgement under California Business and Professions Code §§ 17203 and 17535, requiring Defendants to restore to Celsius and its creditors all funds wrongfully obtained through unlawful, unfair, or misleading business practices and false advertising;

D. For an award of punitive and exemplary damages under California Civil Code § 3294, in an amount sufficient to punish Defendants for their fraudulent, malicious, and oppressive conduct and to deter similar wrongdoing in the future;

E. For an award of prejudgment interest on all damages awarded;

1      F.  For an award of Celsius's costs and expenses of suit, including reasonable attorneys'

2          fees as permitted by law; and

3      G.  For such other and further relief as the Court may deem just and proper.

4

5  Dated: October 17, 2025               WHITE & CASE LLP

6

7                      */s/ Mark E. Gustafson*
                    Mark. E. Gustafson

8                      555 S. Flower Street, Suite 2700
                    Los Angeles, CA 90071-2433

9                      Telephone:  (213) 620-7700
                    mgustafson@whitecase.com

10                     Keith H. Wofford (*pro hac vice forthcoming*)

11                     kwofford@whitecase.com
                    W. Dylan Fay (SBN 344572)

12                     wfay@whitecase.com
                    200 S. Biscayne Blvd., Suite 4900

13                     Miami, FL 33166
                    Telephone: (305) 371-2700

14

15                     Sean Gorman (*pro hac vice forthcoming*)
                    sgorman@whitecase.com

16                     609 Main Street, Suite 2900
                    Houston, TX 77002

17                     Telephone: (713) 496-9700

18                     Stephen Moeller-Sally (*pro hac vice forthcoming*)

19                     ssally@whitecase.com
                    75 State St.

20                     Boston, MA 02109
                    Telephone: (617) 979-9300

21                     Attorneys for Plaintiff,

22                     *CELSIUS NETWORK LIMITED*

23

24

25

26

27

28